CHICAGO TITLE INSURANCE
COMPANY, Plaintiff,

v.

CITIZENS AND SOUTHERN NATIONAL
BANK, Defendant.

Civ. A. No. 1:91–CV–0170–JOF.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 1993.

Joseph R. Manning, Gerald L. Pouncey, Jr., Laura M. Tate, Morris, Manning & Martin, Atlanta, GA, for plaintiff.

Charles Scott Greene, John Treutlen Marshall, Jonathan B. Wilson, Powell, Goldstein, Frazer & Murphy, Carol Eller Kirby, American Telephone & Telegraph Co., Atlanta, GA, for defendant.

## ORDER

FORRESTER, District Judge.

This matter is a declaratory judgment action brought by Plaintiff Chicago Title Insurance Company against Defendant Citizens and Southern National Bank, seeking a declaration as to the coverage obligations under three mortgagee title insurance policies issued to Citizens and Southern National Bank (C & S). This matter is currently before the court on Plaintiff Chicago Title's motion for summary judgment. Defendant C & S has moved for a hearing and for leave to file two supplemental briefs against Plaintiff's summary judgment motion and to reopen discovery.

## I. UNDISPUTED FACTS

In March of 1988, C & S entered into a revolving credit loan agreement with Hooker Holdings USA (Hooker), a wholly-owned subsidiary of Hooker, Ltd., of Australia. Under the terms of the loan, C & S agreed to advance Hooker up to $25,000,000. Although this loan was unsecured, Hooker did execute a negative pledge/guaranty agreement under which it agreed to refrain from pledging certain assets for other loans and guaranteed repayment of the loan. In May, 1989, C & S learned that retailers owned by Hooker were past due in payments to certain trade creditors. The bank decided that these late payments constituted a default under the revolving loan agreement. C & S orally notified Hooker of this default and breach and stated that no more advances would be permitted until further information regarding Hooker's financial situation was provided to the bank. The outstanding debt at the time of this notification was $10,160,000. During the tenure of the loan, the outstanding balance fluctuated between $25,000,000 and zero.[1]

After discussions involving the possible acceleration or pay-off of this loan, a questioning of whether default was actually appropriate, and the possible provision of security for any additional credit extended above the outstanding balance on the revolving loan, the parties instead entered into a new loan agreement on June 19, 1989. Under this second loan C & S agreed to loan Hooker $10,000,000 secured by three mortgages on real property held by Hooker. The loan was used to pay off the outstanding balance on the first loan. C & S also required Hooker to execute solvency certificates on itself and its subsidiaries.

The loan agreement also provided that title insurance had to be obtained. It stated:

> (h) Mortgagee title insurance with respect to the Pledged Real Estate, together with copies of each exception specified therein, assuring the bank that each mortgage is a valid and enforceable first priority security lien and security interest on the property conveyed thereby, free and clear of all defects and encumbrances except for title exceptions permitted by the Bank and such defects and encumbrances as the Bank may reasonably approve, which mortgagee title insurance shall include an endorsement for mechanics liens and any other matter that the Bank may request, and shall provide for affirmative insurance and such co-insurance and re-insurance as the Bank may request.

Counsel retained by Hooker contacted Chicago Title which provided the policies in dispute to C & S. The policies insured the mortgages on the three properties held in fee simple by a subsidiary of Hooker USA, Hooker (7) Atlanta. The properties were located in Volusia County, Florida, Duvall County, Florida, and Richland County, South Carolina. The amount of insurance for each mortgage was $3,206,000, $3,359,000, and $10,000,000, respectively. All policies, however, contained the same coverage language. The relevant language reads:

> SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS AND STIPULATIONS, CHICAGO TITLE INSURANCE COMPANY ... insures, as of Date of Policy shown in Schedule A, against loss or damage, ..., sustained or incurred by the insured by reason of:
>
> ....
>
> 5. The invalidity or unenforceability of the lien on the insured mortgage upon the title: ....

The exclusions from coverage provision at issue reads:

> The following matters are expressly excluded from coverage of this policy and the Company will not pay loss or damage,

---

1. Plaintiff characterizes the payments on the revolving account as having been driven down $15,000,000 in the months just prior to the default notification. Defendant contends, however, that the outstanding balance continued to fluctuate at all times during the life of the loan. This dispute presumably is related to whether the payments during this period constituted preferential transfers or not under the Bankruptcy Code, 11 U.S.C. § 547. Such a determination is unnecessary to resolve this matter.

costs, attorney's fees or expenses which arise by reason of:

. . . .

3. Defects, liens, encumbrances, adverse claims or other matters:

> (d) Attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material;
>
> . . . .

This new loan, however, did not save the day. On August 9, 1989, less than two months after the second loan was executed, Hooker filed for Chapter 11 relief. Shortly thereafter, C & S was informed that Hooker, as debtor-in-possession, would challenge the second loan agreement as a preferential transfer. Hooker also stated it would seek to recover the approximate $15,000,000 supposedly paid down on the first loan within the months prior to the filing of the petition. *See* fn. 1, *supra.* On February 13, 1990, Hooker filed the adversarial proceeding in bankruptcy court seeking the forfeiture of these mortgages and the return of the alleged $15,000,000 pay-down.

Thereafter, C & S told Chicago Title that it considered the challenge to these mortgages an insured event. Chicago Title agreed to provide a defense pursuant to the policy, but it reserved its rights to deny coverage and indicated that it would file a declaratory judgment action seeking a declaration that no coverage existed and rescission of the mortgage insurance policies.

In January, 1991, Chicago Title was told that C & S and Hooker had reached a tentative agreement in the bankruptcy proceeding. This agreement contained mutual covenants not to sue between C & S and Hooker for claims arising out of the facts underlying the transactions between Hooker and C & S. C & S agreed to release its secured interest in the three mortgages on the Hooker properties. Hooker, in turn, covenanted not to sue to recover the alleged $15,000,000 pay-down on the first loan.

Chicago Title refused to consent to this tentative agreement. Hooker and C & S, however, finally agreed to these settlement terms, and a settlement agreement containing these terms was approved by the bankruptcy court on July 24, 1991.

## II. LEGAL DISCUSSION

Although the parties are correct in noting that no court has squarely addressed the question presently before this court, in essence, this matter is simply a construction of a title insurance contract. As this contract was made in Georgia to insure a Georgia-based national bank, Georgia law applies. *American Family Life Assur. Co. v. U.S. Fire Co.*, 885 F.2d 826, 830–31 (11th Cir. 1989); *Federal Insurance Co. v. National Distributing Co.*, 203 Ga.App. 763, 765, 417 S.E.2d 671 (1992).

■ The Georgia courts consider a title insurance contract to be:

> [a]n agreement whereby the insurer, for a valuable consideration, agrees to indemnify the insured in a specified amount against loss through defects of title to real estate, wherein the latter has an interest, either as a purchaser or otherwise; a contract to indemnify against loss through defects in the title to real estate or liens or encumbrances thereon.

*Beaullieu v. Atlanta Title and Trust Co.*, 60 Ga.App. 400, 404, 4 S.E.2d 78 (1939). Typically, title insurance protects a purchaser or mortgagee against defects in or encumbrances on title which are in existence at the time the insured takes his title. *Glass v. Stewart Title Guaranty Co.*, 181 Ga.App. 804, 805, 354 S.E.2d 187 (1987).

■ As title insurance contracts are contracts of indemnity, they are subject to the same rules of construction as other insurance policies. *Black v. Pioneer National Title Insurance Company*, 138 Ga.App. 138, 139–40, 225 S.E.2d 689 (1976); *Beaullieu*, 60 Ga.App. at 404, 4 S.E.2d 78. Insurance policies in Georgia are governed by the ordinary rules of construction. *Progressive Preferred Ins. Co. v. Brown*, 261 Ga. 837, 838, 413 S.E.2d 430 (1992); *Rothell v. Continental Casualty Co.*, 198 Ga.App. 545, 545–46, 402 S.E.2d 283 (1991); O.C.G.A. § 13-2-3. Under ordinary rules of construction, this court must ascertain the intention of the parties by

looking to the entire insurance contract. *Ryan v. State Farm Mutual Auto Ins. Co.,* 261 Ga. 869, 872, 413 S.E.2d 705 (1992); *James v. Pennsylvania General Ins. Co.,* 167 Ga.App. 427, 431, 306 S.E.2d 422 (1983). A court must first consider "the ordinary and legal meaning of the words employed in the contract." *Id.* If this language is plain and unambiguous and does not violate the law, the contract must be enforced as written. *Ryan,* 261 Ga. at 872, 413 S.E.2d 705; *Fidelity & Deposit Co. of Maryland v. Sun Life Ins. Co.,* 174 Ga.App. 258, 260, 329 S.E.2d 517 (1985); *Standard Guaranty Ins. Co. v. Davis,* 145 Ga.App. 147, 151, 243 S.E.2d 531 (1978). If ambiguity is present, however, the policy must be construed against the insurer to provide maximum coverage to the insured. *Ryan,* 261 Ga. at 872, 413 S.E.2d 705; *Claussen v. Aetna Casualty & Surety Co.,* 259 Ga. 333, 380 S.E.2d 686 (1989).

■ Plaintiff relies on the language that states that "[d]efects, liens, encumbrances, adverse claims or other matters . . . attaching to or created subsequent to Date of Policy" are excluded from coverage. Plaintiff argues that the preference claim initiated by Hooker as the debtor-in-possession seeking to avoid the secured interest in the three mortgaged properties arose when the bankruptcy petition was filed and cites to authority which measures the ninety-day preference period under § 547 by counting backwards from the filing date. Whether the second loan constituted a preference within U.S.C. § 547, however, is irrelevant. The settlement agreement finally agreed to by Defendant and Hooker executed on July 24, 1991, is what finally eliminated the lien on the three mortgaged properties. Whether or not the plaintiff should have consented to this settlement in this context does not affect this fact.

Reading the entire contract, this court finds the language of the contract to be clear and unambiguous as to coverage. Defendant offers "expert" opinions as to whether this language contemplated a post-policy preference action. First of all, these experts were not involved in the formation of this contract, and, therefore, their comments only constitute legal advice to the court. Second, just because Chicago Title may have inserted even more specific language in other policies does not mean that the language in this contract actually contemplated coverage of the risk of a preference action voiding the bank's secured interest. After all, no court has ever actually construed this provision against Chicago Title. Finally, whether the parties and language of the title insurance contract contemplated an avoidance by a debtor-in-possession or trustee after the date of the policy need not control here. The contract clearly did not contemplate that the insured would lose its security interest by trading it subsequent to the date of the policy for the right to keep a larger fund received earlier from the debtor. They did, and the plain language excludes coverage.

As the matter was never resolved by the bankruptcy court, it cannot be said definitively that the conveying of the security interests were preferred transfers. Even assuming that they were, that condition arose only because Hooker chose to file bankruptcy and chose to file within the critical time period. Both of these events, which might give rise to an avoidance, transpired after the title policy issued, and, therefore, the loss of the secured position would be excluded from the coverage of the policy because it was occasioned by subsequent events.

This court also notes in passing that aside from the construction of the contract in question and the intent of the parties, sound legal policy would dictate that the defendant should have borne this risk absent specific language to the contrary. Defendant had issued an unsecured revolving line of credit and monitored the debtor's financial position for some time before realizing that Hooker's subsidiaries were having trouble meeting trade creditor obligations. C & S was in a far better position to determine possible future risks in extending further credit. Such risks would have included bankruptcy and an adverse action taken by the debtor-in-possession against its bank-creditor.

The relational model of financing postulates that when a creditor uses a blanket or floating lien under Article 9 of the Uniform Commercial Code securing personal property, both the debtor and the creditor seek to

maximize their joint return by ensuring the success of the venture. Under this symbiotic arrangement, the creditor is in a good position to monitor the ongoing financial wherewithal of the debtor. The arrangement under the revolving line of credit is directly analogous. In this case the bank acknowledged that Hooker was a large depositor as well as a significant debtor. The revolving loan servicing generated significant fees for the bank and kept Hooker's day-to-day operations going. Furthermore, because the loan balance fluctuated, the bank sought to keep close watch on Hooker's financial stability. The bank was, therefore, in a better position than the insurer to encourage Hooker's success ·and to monitor its viability.[2]

Of course, once the secured loan was executed, this relationship changed. A creditor is less likely to involve itself in the day-to-day monitoring of the debtor's financial affairs when the security is real property because land does not move and because its value is less volatile than personal property. At the time the title insurance agreement was executed on the second loan, however, the first loan had not yet been paid off. The bank, therefore, still remained a highly informed monitor of the debtor.

## III.  CONCLUSION

In light of the foregoing discussion, this court finds as follows: Plaintiff Chicago Title's motion for summary judgment is GRANTED [36–1]. Defendant C & S's motion for hearing is DENIED as unnecessary [42–1]. The court had sufficient testimony and documentary evidence to decide the issue without oral argument. Defendant's motions to reopen discovery [48–1] and for leave to file a supplementary brief [48–2], and Plaintiff's responses thereto [50–1] are DE-

NIED as moot. The Clerk of Court is ORDERED to ENTER JUDGMENT in favor of the plaintiff. Because the court finds that Defendant is not entitled to insurance coverage under the circumstances of this case, further action on the issues raised by Defendant's counterclaims and Plaintiff's defenses is unnecessary. See Order of July 18, 1991 [18–1]. The Clerk of Court, therefore, is DIRECTED to DISMISS this action in its entirety.

SO ORDERED.

---

**2.** Since Chicago Title evidently insured quite· a bit of Hooker's properties and mortgages, it could be argued, however, that it also was in a good position to monitor Hooker's finances. Given, however, that title insurers are most concerned with the viability of the lien and checking for a perfect title, it is less likely a title insurer would have information regarding the larger financial picture of the debtor. Without this knowledge, the risk of bankruptcy could not be seen. For a more comprehensive review of these relational and monitoring theories, see the following articles: Scott, *A Relational Theory of*

*Secured Financing*, 86 Colum.L.Rev. 901 (1986); Levmore, *Monitors and Free Riders in Commercial and Corporate Settings*, 92 Yale L.J. 49 (1982); Schwartz, *Security Interest and Bankruptcy Priorities: A Review of Current Theories*, 10 J. Legal Stud. 1 (1981); Jackson & Kronman, *Secured Financing and Priority Among Creditors*, 88 Yale L.J. 1143 (1979). For discussion of these relational and monitoring theories in the context of secured real property, *see* Johnson, *Adding Another Piece to the Financing Puzzle: The Role of Real Property Secured Debt*, 24 Lly. L.A.L.L. Rev. 335 (1991).