2256

FIRST FEDERAL SAVINGS BANK OF BRUNSWICK, Respondent v. STEWART TITLE GUARANTY COMPANY, Appellant, Elinor H. Alpert, Individually and as Executrix and sole beneficiary of the Estate of Leonard I. Alpert, Debra L. Alpert, The Escrow Shoppe, Inc., a Corporation, Mary J. Butler, Individually and as the Principal Shareholder, Officer and Director of the Escrow Shoppe, Inc., Charles Houston, Esq., Ronald F. Hanswirth, Jerry L. Unger, Sherry H. Unger, Equibank, N.A.,

NCNB of South Carolina, Aikman & Company, Carswell of Carolina, Inc., The South Carolina Tax Commission, Beaufort County Emergency Medical Services, Wicks Companies, Inc., and Quinn, Brown & Arndt, of Whom Ronald F. Hanswirth, Jerry L. Unger, and Sherry H. Unger, are Respondents.

(451 S.E. (2d) 916)

Court of Appeals

*Michael W. Tighe* and *Louis H. Lang,* both of *Callison, Tighe, Robinson & Anastasion,* Columbia, *for appellant.*

*Mary Leigh Arnold* and *Susan Taylor Wall,* both of *Holmes & Thomson,* Charleston; *George G.L. Palmer;* and *John J. McKay, Jr.,* Hilton Head Island, *for respondents.*

Heard Oct. 5, 1994.

Decided Nov. 28, 1994; Reh. Den. Jan. 13, 1995.

*Per Curiam:*

First Federal Savings Bank of Brunswick brought these actions at law alleging title defects in two condominium deeds and claiming Stewart Title Guaranty Company had breached mortgagee title insurance contracts by failing to pay First Federal the face amounts reflected in the mortgagee title insurance policies. Stewart Title answered, denying liability. It also asserted third-party actions, joining as third-party defendants, among others, Ronald F. Hanswirth, Jerry L. Unger, and Sherry H. Unger, the owners of the two condominiums. Stewart Title sought in the third-party actions to reform the deeds in question to reflect the owners had fee simple title to their condominiums. Hanswirth and the Ungers counterclaimed, asserting they were insureds under owner title in-

surance policies and requesting either reformation of the deeds or compensation under the title insurance policies. The master severed the third-party actions and tried them first. The master ordered both deeds reformed to reflect the owners held fee simple titles to their condominiums and he found Hanswirth and the Ungers had owner title policies on their condominiums. The master awarded judgment in favor of Hanswirth, the Ungers, and First Federal, awarding them a total of $520,383.76. Stewart Title appeals. We affirm in part, reverse in part, and remand.

Elinor H. Alpert and her husband, Leonard Alpert, owned two Sea Cloisters condominium units. Mr. Alpert died in January 1986 and, as of March 1986, his estate had not been opened and no personal representative had been appointed.

On March 10, 1986, Hanswirth entered into a contract to purchase one condominium unit from Mrs. Alpert for $165,000. The Ungers entered into a contract the same day to purchase the other condominium unit from Mrs. Alpert for $185,000. Both contracts provided the purchasers would receive fee simple title to the units.

Hanswirth and the Ungers retained a mortgage broker through Mrs. Alpert to make all the necessary arrangements to complete the transactions.

On September 9, 1986, First Federal loaned Hanswirth $132,000 that it secured by a mortgage given by Hanswirth on his condominium unit. Two days later, First Federal loaned the Ungers $148,000 that it secured by a mortgage given by the Ungers on their condominium unit.

Stewart Title issued mortgagee title insurance policies on both units in favor of First Federal. The policies provided that Stewart Title insured:

> against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' obligated to pay hereunder, sustained or incurred by the insured by reason of:
> 1. Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;
> 2. Any defect in or lien or encumbrance on such title;
>    . . . ;
> 4. Unmarketability of such title;

    5. The invalidity or unenforceability of the lien of the insured mortgage upon said estate or interest

    . . . .

Hanswirth and the Ungers understood and believed they also purchased owner title insurance policies from Stewart Title. Although the closing statements showed premiums were paid for owner policies, neither Hanswirth nor the Ungers received title policies from Stewart Title.

On September 12, 1986, Mrs. Alpert filed Mr. Alpert's will for probate and obtained letters testamentary. A number of creditors filed claims against Mr. Alpert's estate. On October 14, 1988, Mrs. Alpert filed a petition in bankruptcy.

In late 1988, Hanswirth discovered he did not have proper title to his condominium unit. On advice of counsel, he stopped making mortgage payments to First Federal in February 1989 due to the title defect. Hanswirth told the Ungers of the defect. In April 1989, they also stopped making mortgage payments to First Federal.

When First Federal learned of the title defects, First Federal on April 11, 1989, and on April 17, 1989, notified Stewart Title in writing of the title defects. First Federal outlined the title defects for Stewart Title's benefit and demanded the face amounts of the policies.

On April 17, 1989, Michael Britt, Stewart Title's State Manager for South Carolina, acknowledged First Federal's claims and stated Stewart Title had commenced an investigation. On the same day, Hanswirth and the Ungers notified Stewart Title of their claims relating to the same property.

On May 11, 1989, First Federal's lawyer wrote to Britt inquiring about the status of its claims. First Federal advised it would commence action if Stewart Title did not honor its claims. Stewart Title did not respond to the inquiry.

Stewart Title failed to inform First Federal, Hanswirth, or the Ungers of the status of its investigation and failed to advise any of them of the outcome of its investigation and how it planned to respond to their respective claims.

The first notification First Federal had that Stewart Title had determined the mortgagee policies covered the title defects and that it would attempt to cure the title defects was

when Stewart Title answered and filed its third-party complaints on August 17, 1989, in response to the complaint filed by First Federal on June 12, 1989.

As we noted above, the master reformed both deeds after severing the third-party actions and conducting a hearing on them first. Although the master conducted the hearing on June 9 and 10, 1990, the master delayed entering his order reforming the deeds until October 25, 1991, some sixteen months later.

After the master reformed the deeds, neither Hanswirth nor the Ungers made any payment to First Federal to bring the mortgage balance current. As a result, on January 30, 1992, First Federal initiated mortgage foreclosure proceedings against Hanswirth and the Ungers in state court. Hanswirth and the Ungers answered the foreclosure complaints, asserting affirmative defenses of estoppel, collateral estoppel, unclean hands, acts or omissions of third parties, and insufficiency of consideration. They counterclaimed as well, alleging First Federal had violated the Frivolous Proceedings Sanctions Act, S.C. Code Ann. § 15-36-10 *et seq.* (Supp. 1991).

Hanswirth and the Ungers also commenced two separate actions against First Federal in the United States District Court. Their actions, which they filed on February 5, 1992, alleged five separate causes of action in which they attacked the validity and enforceability of the notes and mortgages given to First Federal. They sought to have their obligations under their notes discharged and the mortgages securing the notes declared unenforceable. First Federal denied all allegations and asserted several affirmative defenses. The state foreclosure actions were removed to federal court and consolidated for discovery and trial.

On May 14, 1992, First Federal made a demand upon Stewart Title under its mortgagee title policies to assume the defenses of the federal court actions. Stewart Title refused to defend the actions.

The master issued an order on July 10, 1992, finding Hanswirth and the Ungers had enforceable owner title insurance policies with Stewart Title.

The federal court cases went to trial in November 1992 and resulted in a directed verdict in First Federal's favor on the claims alleged by Hanswirth and the Ungers and in an order

permitting First Federal to foreclose its mortgages. Hanswirth and the Ungers subsequently paid First Federal all principal and interest due under the notes and mortgages and $50,000 for attorney fees that First Federal incurred in the foreclosure action.

On July 7, 1993, the master entered his final order of judgment for First Federal, Hanswirth, and the Ungers. The master found Stewart Title breached its duty under the title policies to cure the title defects timely and to defend the claims alleged in the federal court action; Stewart Title had a duty to protect the validity and enforceability of the mortgage documents, but had failed to do so; Stewart Title had a duty to reimburse First Federal for all attorney fees and costs incurred in the actions but had failed to do so; and Stewart Title failed to pay for Hanswirth's and the Ungers' legal expenses, although Stewart Title had conceded it had an obligation to pay for these expenses.

The master awarded First Federal $315,079.96 in attorney fees for the state and federal actions. He awarded Hanswirth and the Ungers $99,528.92 in attorney fees for the state action and $50,000 for the attorney fees that Hanswirth and the Ungers paid to First Federal in the federal foreclosure action. The master also awarded Hanswirth and the Ungers $50,000 for "depreciation in value" of their condominiums from April 1989 through October 1991.

## I.

Stewart Title challenges the master's findings that Stewart Title did not honor the claims made by First Federal, Hanswirth, and the Ungers.

Under our limited scope of review in this case, we hold there is no evidence in the record to support the master's findings in these regards. *See Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E. (2d) 773 (1976) (in an action at law tried without a jury, the trial judge's findings of fact will not be disturbed on appeal unless no evidence reasonably supports these findings). In each instance, Stewart Title did what it was permitted to do under the insurance contract, namely, it elected to pursue litigation to clear the title defects in issue. The litigation resulted in both title problems being cured. There is absolutely no evidence to the contrary. Hav-

ing cleared the title defects in question, Stewart Title fulfilled its contractual obligations to the policy holders.

The express terms of the policies governed Stewart Title's obligations to the insureds. *South Carolina Ins. Co. v. White*, 301 S.C. 133, 390 S.E. (2d) 471 (Ct. App. 1990). Paragraph 3(c) of the Hanswirth mortgagee policy reads:

> [Stewart Title] shall have the right at its own cost to institute and without undue delay prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. . . .

Paragraph 4(b) of the Unger mortgagee policy likewise provides:

> [Stewart Title] shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest or the lien of the insured mortgage, as insured. . . .

The owner policies contain virtually identical provisions.

Later provisions in each policy further limit Stewart Title's liability. One of these limitations, paragraph 7(b) of the Hanswirth mortgagee policy, reads:

> No claim shall arise or be maintainable under the policy . . . in the event of litigation until there has been a final determination by a court of competent jurisdiction . . . adverse to the title or to the lien of the insured mortgage, as insured. . . .

The same limitation may be found in the Unger mortgagee policy; however, the limitation there uses slightly different language. Paragraph 8(b) reads:

> In the event of any litigation, including litigation by [Stewart Title] or with [its] consent, [Stewart Title] shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction . . . adverse to the title or to the lien of the insured mortgage, as insured.

The owner policies contain the same litigation.

By clear and unambiguous language, then, Stewart. Title had the option to establish by litigation the title as Stewart Title insured it in each case and Stewart Title had no liability for loss or damage where litigation ensued until a court determined the title was not as it was insured to be. *Lawyers Title Ins. Co. v. Synergism One Corp.*, 572 So. (2d) 517 (Fla. Dist. Ct. App. 1990), *reh'g denied,* 583 So. (2d) 1037 (Fla. 1991).

Here, Stewart Title, as paragraph 3(c) of the Hanswirth mortgagee policy, paragraph 4(b) of the Unger mortgagee policy, and similar provisions in the owner policies gave it the right to do, elected to seek by litigation, albeit by third-party complaint, to have a court determine the question of whether the titles insured by its policies were as they were insured. The court, rather than speak adversely to the title, resolved the title defects. Absent a finding adverse to the title or to the lien, as the case may be, no claim arose or loss occurred for which Stewart Title could be held responsible under its policies. *See Falmouth Nat'l Bank v. Ticor Title Ins. Co.*, 920 F. (2d) 1058, 1062-63 (1st Cir. 1990) ("[T]he loss must be actual; the mere existence of a defect covered by the policy in and of itself is not sufficient to justify recovery."). In short, Stewart Title did not breach its insurance contracts with First Federal, with Hanswirth, or with the Ungers because each policy gave Stewart Title an option other than the option to pay, an option that Stewart Title never surrendered. *See George K. Baum Properties, Inc. v. Columbian Nat'l Title Ins. Co.*, 763 S.W. (2d) 194 (Mo. Ct. App. 1988) (a title insurer's mere failure to pay a claim does not result in a breach of the policy where alternative obligations other than the obligation to pay the loss are imposed on the insurer and these obligations have not been surrendered).

We do not overlook the trial court's finding, which Stewart Title challenges, that Stewart Title did not timely act on the "claims" made by First Federal. Aside from the fact that Stewart Title instituted litigation by third-party complaint just four months after learning of the problems with the titles, there is the matter of the limitation embraced by paragraphs 7(b) and 8(b); quoted above, and how it affects action by the insurer on a "claim" or "loss."

As the court in *Synergism* points out, "[a] title policy indemnifies rather than guarantees the state of the insured title."[1] 572 So. (2d) at 518. Where litigation has occurred, as here, there can be no claim or loss until there is an adverse title determination by a court. *See id.* (" 'The claim only lies once a court speaks, and not before, and not if the court's judgment is favorable.' D. Burke, *Law on Title Insurance* (1986 & 1988 Supp.), section 9.4.3., titled *Staying the Claim for Pending Litigation.").*

There were, then, no claims for Stewart Title to act upon once Stewart Title elected, pursuant to the limitations contained in paragraph 7(b) and paragraph 8(b), to litigate. Indeed, to hold otherwise would rob Stewart Title of its right under each policy to institute litigation to cure a defect in a title or lien and thus would convert each policy from one that

---

[1] In *Lawyers Title Ins. Co. v. Synergism One Corp.*, 572 So. (2d) 517 (Fla. Dist. Ct. App. 1990), *reh'g denied,* 583 So. (2d) 1037 (Fla. 1991), an insured sued a title insurance company. The trial court awarded the insured damages after holding the two years and nine months the title company took to clear title was an unreasonable time. Paragraph 7 of the policy read in part:

> No claim shall arise . . . under this policy (a) if [the title company], after having received notice of an alleged defect . . . insured against hereunder, by litigation or otherwise, removes such . . . or establishes the title, as insured, within a reasonable time after receipt of notice; (b) in the event of litigation until there has been a final determination by a court of competent jurisdiction. . . .

Paragraph 7(a) of the Hanswirth mortgagee policy contains language that is virtually identical to paragraph 7(a) of the policy at issue in *Synergism* while paragraph 8(a) of the Unger mortgagee policy contains language that is substantially the same as that policy. Paragraph 8(a) reads in part:

> If the Company establishes the title, or removes the alleged defect . . . as insured, in a reasonably diligent manner by any method, including litigation . . ., it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused thereby.

The Florida court expressly rejected the insured's contention that paragraphs 7(a) and 7(b) should be read together and when read together a claim could arise if the title company did not clear title within a reasonable time. Instead, the Florida court expressly agreed with the title company's argument "that only section (b) applies since there was litigation to quiet title." 572 So. (2d) at 518. *Cf. Cocoa Properties, Inc. v. Commonwealth Land Title Ins. Co.*, 590 So. (2d) 989 (Fla. Dist. Ct. App. 1991) (holding paragraph 7(a) controls where the title insurer elects to litigate pursuant to paragraph 7(b) and the litigation does not result in a final judicial determination either favorable or adverse concerning title).

indemnifies the insured's state of title into one that guarantees it.

There were also no losses for Stewart Title to indemnify because in both instances the litigation that Stewart Title chose to bring led to favorable results.

## II.

Stewart Title argues the master erred in concluding Stewart Title was liable to First Federal for the attorney fees that First Federal incurred in defending the two actions that Hanswirth and the Ungers brought against First Federal in federal court. We agree.

Each mortgagee policy contains a provision, paragraph 3(a) in the Hanswirth policy and paragraph 4(a) in the Unger policy, that declares Stewart Title will provide the insured a defense in "litigation . . . founded upon an alleged," in the case of the Hanswirth policy, or "to those stated causes of action alleging a," in the case of the Unger policy, "defect, lien, encumbrance, or other matter insured against by [the] policy." Expressly excluded from coverage in each policy are "defects, liens, encumbrances, adverse claims, or other matters . . . created, suffered, assumed or agreed to by the insured claimant. . . ."

We turn to the allegations contained in the complaints filed by Hanswirth and the Ungers in the federal court to determine whether Stewart Title owed First Federal a defense. *See Mattson v. St. Paul Title Co. of the South*, 641 S.W. (2d) 16 (Ark. 1982) (a title insurer's duty to defend is determined from the pleadings).

The complaints in the actions that Hanswirth and the Ungers brought in federal court do not attack the underlying debt, do not question either the validity or enforceability of the mortgages, and do not assert title defects. Rather, these complaints state claims for negligence, constructive fraud, breach of contract accompanied by a fraudulent act, and violation of the Racketeer Influenced and Corrupt Organizations Act based on allegations that the loan documents had been altered to reflect a different interest rate margin and that Hanswirth's and the Ungers' signatures on the loan documents had been forged. Looking solely, as we must, to the allegations contained in Hanswirth's and the Ungers' complaints, we hold

they clearly constitute "litigation" or "stated causes of action" based on alleged intentional tortious conduct or "adverse claims" committed or "created" by the "insured claimant" First Federal itself or by its agent. They do not constitute "litigation" or "stated causes of action" based on an alleged "defect . . . or other matter insured against by [the] policy."

Stewart Title, therefore, had no duty to defend the actions brought by Hanswirth and the Ungers. *See Bank of Miami Beach v. Fidelity and Casualty Co. of New York*, 239 So. (2d) 97 (Fla. 1970) (a title company owed no duty to defend a mortgagee in a forgery action brought by a mortgagor where the mortgagor attacked the note and not the mortgage and the title company only insured the mortgage); *see also Federated Mut. Ins. Co. v. Piedmont Petroleum Corp.*, — S.C. —, 444 S.E. (2d) 532 (Ct. App. 1994) (an insurer has no duty to defend if the facts alleged in a complaint against an insured fail to bring the claim within the policy coverage and an insurer has no duty to defend an insured where the damage was caused by something unambiguously excluded under the policy). Consequently, we reverse the award of attorney fees and costs to First Federal based on Stewart Title's failure to defend the actions brought by Hanswirth and the Ungers.

### III.

Stewart Title also claims error in the master's awarding to First Federal attorney fees incurred by First Federal in bringing foreclosure actions against Hanswirth and the Ungers. We agree.

A mortgagee title insurance policy does not guarantee the mortgagee that the mortgagor will make the mortgage payments. *See Narbeth Bldg. & Loan Ass'n v. Bryn Mawr Trust Co.*, 126 Pa. Super. 74, 190 A. 149, 151 (1937) ("The provisions of [a mortgagee title policy] did not constitute the [title insurance] company a surety for the mortgaged debt, nor a guarantor of its payment."). All a policy of that kind does is insure the adequacy of the title to the mortgaged property. *Miller v. Commercial Standard Ins. Co.*, 248 So. (2d) 675 (Fla. Dist. Ct. App. 1971). The lender, and not the title insurer, shoulders the credit risk in a real estate loan. *Chicago Title Ins. Co. v. Citizens and Southern Nat'l Bank*, 821 F. Supp. 1492, 1495 (N.D. Ga. 1993) (a de-

claratory judgment action brought by th the insurer against the insured to determine coverage under a mortgagee title policy wherein the court observed "sound legal policy should dictate that the [insured] would have borne [the] risk absent specific language to the contrary."). A mortgagee title insurer is under no duty to prosecute a foreclosure action.

When Hanswirth and the Ungers discovered the defects in their titles, they were advised by counsel to cease making their mortgage payments. The defects in their titles, however, did not serve to forgive their obligations to repay the sums that they had borrowed from First Federal against the property. Furthermore, once the defects were removed, any dispute regarding repayment of the mortgages clearly could not have related to the defects.

We therefore reverse the award of attorney fees incurred by First Federal in the foreclosure actions brought to enforce its mortgages.

In doing so, we do not overlook the pleadings filed by Hanswirth and the Ungers in response to First Federal's foreclosure complaints. These responsive pleadings, outlined above, fail to assert any factual allegations that would require Stewart Title to provide First Federal with a defense. As with the complaints filed by Hanswirth and the Ungers in the federal action, the allegations set forth in their responsive pleadings in the foreclosure action neither raise any question concerning the validity or enforceability of the mortgages nor assert a defect in the titles.

## IV.

Stewart Title further maintains the master erred in awarding Hanswirth and the Ungers the amounts that they had paid to First Federal in attorney fees when Hanswirth and the Ungers settled the foreclosure actions. More precisely, the amounts represent attorney fees due First Federal from the mortgagors under the terms of the notes. The notes provide for an award of attorney fees in case of default.

Again, we agree with Stewart Title.

Nothing in either policy insures an owner against the costs of defending a foreclosure action brought as a result of the owner's not making the mortgage payments.

Each policy, however, excludes matters created, suffered, assumed, or agreed to by the insured and matters occurring after the effective date of the policy. Hanswirth's and the Ungers' decisions not to make the mortgage payments occurred, obviously, after the effective date of each policy.

We therefore reverse the award to Hanswirth and the Ungers of the amounts that they had paid to First Federal as attorney fees when they settled the foreclosure actions.

## V.

Stewart Title complains of the award by the master of $99,528.92 in attorney fees to Hanswirth and the Ungers for work it argues was performed in regard to the federal court and the foreclosure actions. At the same time, however, Stewart Title agrees that Hanswirth and the Ungers are entitled to attorney fees incurred in this action in the amount of $31,933.12, which represents fees incurred by them because of their being named as parties defendant in Stewart Title's third-party actions to reform the deeds in question and because of their efforts to establish coverage; consequently, we affirm the award to this extent. *See Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co.*, 274 S.C. 468, 265 S.E. (2d) 38 (1980); *Hegler v. Gulf Ins. Co.*, 270 S.C. 548, 243 S.E. (2d) 443 (1978) (cases upholding attorney fees awards to insureds after the insurers lost declaratory actions to determine their duty to defend).

We reverse the $99,528.92 attorney fees award to the extent that the amount includes attorney fees for time spent representing Hanswirth and the Ungers in any action save the third-party actions. We therefore remand for redetermination on the present record of the amount of attorney fees to be awarded Hanswirth and the Ungers for time spent by their counsel in participating in Stewart Title's third-party actions and in establishing owner coverage beyond the amount concededly due them.[2]

---

[2] Hanswirth and the Ungers submitted the 127-page affidavit of John J. McKay, Jr. in support of their claims for attorney fees. The affidavit reflects McKay billed Hanswirth and Ungers $99,528.92 for fees and expenses incurred between April 30, 1989 and April 2, 1993. The issues regarding the defects in the title were resolved, as we mentioned, on October 25, 1991, when the trial court entered its order.

## VI.

Finally, Stewart Title argues the master erred in awarding Hanswirth and the Ungers $25,000 each for depreciation of their respective condominium units from April 1989 through October 1991.[3] We agree.

Here, Stewart Title, as was its right under each owner policy, brought an action to remove the defect in each title. In each instance, the action met with success; consequently, there was no actual loss which either insured sustained and for which Stewart Title was required to indemnify the insured. *First Federal Sav. and Loan Ass'n of Fargo, N.D. v. Transamerica Title Ins. Co.*, 19 F. (3d) 528 (10th Cir. 1994).

Affirmed in part, reversed in part, and remanded.

SHAW and GOOLSBY, JJ., and HOWARD, Acting Judge, concur.

---

[3] Although there was expert testimony that both condominiums declined about eleven percent, or about $25,000, between April 1989 and October 1991, the witness did not say what caused the decline.

Further, the depreciation claimed by Hanswirth and the Ungers was unrealized depreciation. No testimony established the Ungers either could not use their condominium unit or wanted to sell it during the period in question but could not do so because of the title defect. Hanswirth testified he decided to sell his unit sometime in 1988 or 1989; however, he did not testify that he took any steps to sell the unit.